Car Craft *v.* Berman.

Argued June 4, 1971, before Judges CRUMLISH, JR., MANDERINO and ROGERS, sitting as a panel of three.

*Herbert F. Holmes, Jr.,* for appellant.

*Kenneth A. Cardone,* with him *David Durben* and *Walsh, Durben & White,* for appellee.

OPINION BY JUDGE MANDERINO, August 12, 1971:

Joseph Berman suffered a retinal detachment on August 18, 1966 when he was struck on the head by a piece of metal while in the employ of Car Craft as a body and fender repairman. A compensation agreement was entered into on September 15, 1966, the terms of which required Car Craft to pay compensation to Berman for permanent and total disability. On November 8, 1967, Car Craft petitioned the Workmen's Compensation Board to end the compensation agreement for the reason that Berman was no longer disabled and could return to his former occupation. Hearings were commenced before a Referee on June 8, 1968, who concluded that Berman had a permanent partial disability and was entitled to a compensation award based essentially on the difference between Berman's new employment as a custodian at lesser wages than he received in his old employment as a body and fender repairman. Car Craft appealed this decision to the Workmen's Compensation Board, which reversed the decision of the Referee and terminated the compensation agreement. From that decision, Berman appealed to the Court of Common Pleas of Bucks County which reversed the order of the Board and reinstated the Referee's decision. It is the decision of the lower court which Car Craft now appeals to this court.

In this case, the Referee, the Board, and the lower court, all agreed on the essential facts. They agreed that Berman suffered an injury in his employment as a body and fender repairman and that he suffered retinal detachment of the right eye. They further agree that after surgical intervention and reattachment of the

retina, Berman suffered a loss of fifteen percent (15%) of peripheral vision and some malfunction of the muscles of the right eye that produces, at times, two planes of vision or double vision. They all also agree (and this is the heart of the matter) that "in addition, the area of the retinal reattachment, while firmly knit, is so slight that the claimant may not return to any form of heavy employment without serious risk of recurrence of retinal tear along the very thin line of reattachment with irreparable results."

We emphasize that the Referee found the above facts, as well as the Compensation Board and the lower court.

From the above facts, however, the Referee and the lower court concluded that Berman had a partial disability which prevented him from performing his work as a body and fender repairman. The Compensation Board arrived at a different conclusion on the same findings of fact. The Board concluded that Berman did not have a partial disability. Thus the lower court's disagreement with the Board occurred because different conclusions were drawn from the facts agreed upon.

The Board explicitly accepted the findings of fact by the Referee (as did the lower court) and gave its reasons for differing with the ultimate conclusion. The Board's opinion stated:

"Notwithstanding the testimony of the defendant's medical witnesses, we are persuaded, as was Referee Nelson, by the testimony of the operating surgeon and his assessment of the present condition of the repaired retina. Dr. Ainesley carefully explained that, although the reattachment was firm, the repair was precarious in that the area of reattachment was not wide or extensive (N.T. 49). Dr. Ainesley was explicit in his opinion that Berman should not be exposed to the working condition at the time of the accident, that any

trauma to the head, bending over to lift or lifting anything over twenty-five pounds would seriously endanger the retinal attachment (N.T. 42, 51).

"We are inclined to affirm the Findings of Fact of the Referee. We find no disagreement with his acceptance of the testimony of the operating surgeon. We do not believe, however, that the Findings of Fact support a conclusion that the claimant is totally disabled. *The medical evidence here restricts the activities of the claimant only for the protection of his eye. It does not state that he is incapable of doing the work which he formerly did, it merely concludes that he might suffer the loss of an eye if he does such work. The Workmen's Compensation Act provides compensation for the loss of an eye and Section 413 removes all time limitations for the making of this claim.* We do not believe that the Courts would interpret disability in terms of the danger to a part of the body whether that part be the eye or the finger. Otherwise, the danger to the loss of any eye, interpreted as a disability, would accrue more compensation than the loss of the eye itself. Under the same circumstances, the danger of the recurrence of a back injury or hernia might be as compensable as the back condition or the hernia condition itself. Indeed, we believe that Section 413 of the Act allows the claimant two years to show a recurrence in disability in recognition of the possibility that an accidental injury predisposes that claimant to future disability." (Emphasis added.)

It is apparent that the Board's theory in arriving at its conclusion was that an individual must return to his former employment even if it involves a very serious risk of additional permanent injury. The Board seemed to feel that since the law would permit compensation for the loss of an eye, Berman was required to continue his old employment and if the loss of an eye occurred he would be paid for it. We find it im-

possible to accept this interpretation of disability. The Board accepted the Referee's finding that "the area of retinal reattachment, while firmly knit, is so slight that the claimant may not return to any form of heavy employment without serious risk of recurrence of retinal tear along the very thin line of reattachment with irreparable results." The Board points out in its opinion that it accepts the medical testimony that "Berman should not be exposed to the working condition at the time of the accident" because "any trauma to the head, bending over to lift or lifting anything over twenty-five pounds would seriously endanger the retinal attachment."

The Board's reasoning gives a very narrow interpretation indeed to what the law will allow as legitimate reasons for an employee not to return to his former heavy employment and accept employment at a lesser paying position. The law cannot possibly say to a human being that because his arms and legs and muscles are intact, he must return to employment which involves heavy exertion and effort because he has the capability of using the arms, legs and body muscles to do the heavy work—even though while doing it, the odds are overwhelming that he will lose an eye permanently. We have found no such interpretation of the law. The reasoning which the Board applied in arriving at its conclusion would mean that an individual who has suffered a serious heart attack, but is otherwise physically intact, must return to work and perform heavy exhausting labor because his body is capable of doing it even though there may be a medical certainty that in the course of the heavy work another attack will occur resulting in death. The able analysis and reasoning of Judge BODLEY in the lower court refused to arrive at such a conclusion and we agree.

The lower court reversed the Board because it had committed an error of law. This was within the au-

thority of the lower court after it accepted the Board's own Findings of Fact. *Gill v. Fives,* 170 Pa. Super. 564, 88 A. 2d 109 (1952).

The decision of the lower court is **affirmed.**